Good morning. May it please the court, Elliot Field for the plaintiff, Royal Lee. As the court is aware, we're here on a summary judgment decision from the district court in South Carolina, and we're asking the court to reverse that decision and remand these cases to the district court for jury trial. There were two state court cases that were also sent back to state court. We'd ask the court to rule that those cases also come back in for jury trial. The basic precedent in this case is the Altman case where the basic test is whether the officer acted objectively, reasonably in shooting the dog, and there's a number of inconsistencies in the argument from the appellees. Taking the light most favorable to the plaintiff, we believe that a reasonable juror could determine that the officer acted unreasonably. There are a number of inconsistencies with Officer Giglio's... They were coming for a call for service that was non-emergency. There's not a warrant. There's no exigent circumstances. There's not gang activity. There's not any heightened reason for them to be there. It's an old neighborhood in Fort Mill. He's driving down the street, and in the video, you can hear him saying he's talking about his vacation. He's talking about him going on vacation. In his deposition, he says, look, doing a text message. Officer Giglio, who's a passenger to Officer Lyons, and he's doing a text message. He can't remember if it's personal or business, so he's not really paying attention. He pulls up. He sees the dogs on the porch. He testifies they're on the porch, so they're not running at large like in the Altman case where each was running at large. These dogs are on the porch, under the control. The plaintiff and Molly, his girlfriend, are on the porch. The dogs are there. They pull up. He says, oh, that's 502, and then he says, this must be 500. He sees them on the porch. Officer Chief Marshall or Captain Marshall asks him in the video, he says, were they running loose? Were they running loose? He says, no, they were on the porch. Their paws were down. They were sitting down, so they're in the yard on the porch under the control. The Fourth Amendment, of course, says people were right and secure of our effects against unreasonable seizures shall not be violated. Of course, Altman expounded that law tremendously. So then what happens? They get off the porch. Well, he pulls up, and Officer Lyon gets out. It's like 20 seconds or something. There's dogs barking next door, so the dogs are still there. Then Officer Giglio gets out, and he gets out of the car. Then in his deposition, he says, oh, I closed the door. I closed the door, and they were like five feet away. But then we have an eyewitness, Chris Potts, who's looking directly at it. You see him in Lyon's video, because they pull up past the house, and Potts is looking this way, and he can see everything. He said, hell, he's trying to discredit that, and they used the Stokes case or that Supreme Court case, but everything lines up in these cases. Well, give us your version of what happened. Dan. How many feet? If that matters, give your version. Okay, thank you. And so he pulls up. He gets out. The door's open, so he could go back in the car, and then the dogs are there. Now, why would he go back in the car? I thought he was there to respond to something. He's responding. I'm following your scenario. You said he could go. Why would he go back in the car? Well, he opens up the car, and he sees the dogs coming. So at that point, he shoots the dogs. Oh, so the dogs are coming now. See, but we left with the dogs paused down on the porch under control of the labor. How does he get from there to the dogs coming? Well, when they pulled up, as dogs are likely to do, they will run towards vehicles or people coming in their yard. Were they wagging their tails, or what were they doing? They were being friendly, approaching the car. They were approaching the car, mouthing each other. One of our witnesses says they're mouthing and playing and approaching a car that would come up. I think if somebody comes up in the yard, a dog will approach as they do. They're family pets with a long history of being with children and working with children in daycare. And again, contrary to the Altman case, they have no history of violence. Nobody's calling them, saying they're attacking anybody or anything like that. And the police officers know their history? No, they don't. It's subjective. No, they would not. They're big dogs? They're 70 pounds. One's a boxer and one's a boxer-pit mix. And T, the one that was shot, is a boxer-pit mix. But he's approaching the car. The relevance of the door being open is that the officer turns, and in the video you can see this. He turns. He points his gun this way. And so he's pointing this way. So the dogs are, he says they're approaching. So, I mean, they're coming from the porch. And Lee goes in the house. The plaintiff, Molly, is on the porch. And then when he comes out, there's boom, boom, boom, and the dog is shot. Then running around the yard, and Lee comes out. So what I'm saying is that an objective, reasonable officer is more like Officer Lyons, who has many years' experience. Officer Giglett is a resource officer, and he's just coming in that situation. He's on a ride-along in the summer. He's talking about his vacation. He's texting messages. He's not even paying attention. He's not even paying attention. Is that reasonable? Is that objectively reasonable? I'm sorry. I thought in the very beginning of your explanation of the facts, you were telling us this wasn't an emergency situation. This wasn't a dangerous neighborhood. That there was no reason for any of this. Is that wrong? Oh, no, that's exactly correct. That's exactly correct, Judge Motz. But I'm just saying, even if it's a normal situation, would you be texting and talking about your vic-it? Maybe you would. Maybe that's reasonable. I think what I'm trying to say is that on the facts in this case, Your Honors, is at some point this law has to have some teeth.  It can't just fully be every time the officer gets a pass at making his decision. There's a balancing test. Is it your position that it was unreasonable for him to be frightened and scared for his own safety? No, it's not unreasonable for someone to be frightened or scared. I'm scared right now, not for my safety. That's reassuring. But I think that, no, it's not unreasonable at all. But is it objectively reasonable? Okay, that's the question. Do you think it's objectively unreasonable for him to be scared in this situation for his own safety? I think it's a jury question. I think, given the facts, that a jury, a reasonable juror, could determine, looking at these videos, and there's so much inconsistency in the deposition. I don't want to attack the appellees, but in their briefs they even misstate these facts that are laid out in my brief. I mean, come on. The guy pulls up. The dogs are on the porch. They run towards the car. And the first thing he does is blow them away. I mean, can't he? The door's open. Why can't he get back in the car? Why, when he pulls up, he can't say, keep the dogs on the porch or put the dogs in? Your position is he just got out of the car and the dogs were running. So, for fun, he shot them? No, of course not. Of course not. Well, why do you think he's shooting at them? I think he's shooting at them. Well, it doesn't – why do I think he's shooting at them? Well, give me the facts in the broad light and it's favorable to you to explain a situation where he would not have an objectively reasonable reason to shoot at the dog. Well, he didn't even yell or say stop or use a baton or a taser or a catch pull. Fort Mill has not even trained these officers. They both testify, Clack and Giglio, that they had no training at Fort Mill. None, zero. They said, we've had no training. Is that reasonable for an officer to come out? There's dogs everywhere. They get no training. So it's just up to the officer. He gets to carry a gun. He gets to carry a gun so he can use it at will. I'm frightened so I get to use my gun on this family pet, not running at large, not under control. The owner was there wanting to take control. Those are distinguishing in the Brown case that you cite and the Altman case. I mean, there's a lot of I think it's a jury question whether the reasonableness, if it's reasonable, and also credibility of the witness, Your Honors. He lies under oath in his deposition multiple times. And he's lying. He contradicts himself. He says in deposition, door was closed, door was closed. Can't you hear the door closed in the video? Can't you hear both doors closed? No. You don't hear two doors closed in the video? I hear something, but he tells Marshall, he says to Marshall, he says the door is open. He says the door is open. I've got the specific site. I just want to make sure we're clear about this. You deny that you can hear two doors closed in the video. I'm not sure what I hear when he gets out of that car. I hear lions get out and the door closed. I hear Gigglio get out, and I'm not sure. I'm not sure. I don't see it, Judge Traxler. I don't know if it's the door closing or if the door is creaking open. Maybe the door is opening and it's creaking. But I know this, Judge Traxler, in that video what you see is he tells Captain Marshall the door was open. He says the door was open. And he says, I'm standing here, and you can look at it on the video. Let the jury see the video. Let them determine if they can hear that door close or is it the door creaking open. I don't know, Judge Traxler. It sounds to me like what you're arguing is basically that he had alternatives, reasonable alternatives, that he had time to use, assess and use, and that he should have used them. So he's unreasonable for not taking advantage of those. Like in the Altman case, we're not asking you to jump in his mind. He's got it right. The officer has to be quick. They have to be quick. They're making split-second decisions. It's happening quick. We're not asking you to jump in his shoes and decide, make that determination, because I know they all determine differently than that in the Altman case. I mean, I think that in this situation, without these other factors, it's not a search warrant. It's not exigent circumstances. There's nothing. It's friendly dogs. I mean, at what point is it too much? I have a Labrador. Can they pull up, and my lab runs up, and they just get startled and shoots them? I mean, you know, the dog's in the yard. They're under the control of the owners. They pull up. They're in the grass. How do you know they're under? What's the evidence that shows they're under control of the owners? Well, they're sitting on the porch with the owners, and Officer Goodwill says that the paws are down and they're on the porch. So, to me, that's under their control, and when they run up to the car. Just because they're there and sitting down, they're under the control of the owners. I think it's a jury question. I think they're on their property, and the owners want to take control of them, like in the Brown case that's cited in the Altman case. The owner's there. She was jumping out the window when that officer shot her rottweiler. She's jumping through the screen to say, no, no, no, don't shoot my dog. And so I'm saying that the owner's there. Molly's there. She's right there on the scene. She says, you know, they run up and greet people. I'm just saying at some point, and then they're lying under oath. They're lying under oath. What other scenario, Mr. Field, did Molly say, and many owners do sometimes say, don't worry, the dogs don't bite? Was that said? She never said they do bite. I don't know that she said that specifically. Most owners say that when a friendly dog rubs up to a stranger. The first thing you want to say, they're very friendly. They're just pets. She says they jumped up on the car. She says they run and jump up. But she didn't say anything that would dissuade someone to say, listen, they're pets, they're friendly, that's the way they greet people. Under your scenario, is that? Could you rephrase that last part? I'm sorry. I'm asking is there anything that Molly was saying that would give the police officer comfort since they don't know the history of Judge Marks. Her question to you is you said they didn't say, well, don't worry, they're friendly, they're big, but they don't bite. I mean, most owners do that. Judge Gray, if I may, I think she equivalently said that when she said they run up and jump on people. I think she basically – She told the police that they run up and jump on people? She said they greet people, yeah. I think that's what she said, Your Honor. She knows the record, right? Yes. Then the record, that's what she said? I think that's what – That's okay. You can look at that. But I was just wondering, in your version, does she do that? Because you said she's under control because you want to protect your dogs and your people. So you run right behind the dogs and say, well, hold on, I got them, they're friendly, they don't bite. You got to be proactive because police officers are there for a job to be done and you want to do everything you can to say, obviously, because you know they have guns, right? Did she run after the dogs? She ran up and said, yeah, I mean – So she was right there with the dogs when the police officer shot her? I wasn't there. The video doesn't show that. No, you weren't there, but you keep referring to it. It's a fact you don't want to tell us about. You're not there. But what does the video tell us? The video shows that it's pointing forward. It's not that I don't want to tell you. I'm happy to tell you. Does it show that he almost missed her because she's right there with the dogs? I mean, she's probably not as quick as a dog, you know, running, right? I mean, I'm just saying, Your Honors, I mean, I'm just saying, I think it's unreasonable. I think the facts that we present, a reasonable juror could find that what the officer did was unreasonable. It's certainly not fair and it's certainly not right. And we have witnesses to that effect. Chris Potts says the dogs never left their yard. They're saying they left their yard. I mean, there's a lot of inconsistency and credibility is not for this jury to determine. I mean, I respectfully would say that. I would like a jury to hear the case and watch the videos. Let a jury of 12, maybe we'll come back after that. But I'm just saying, let a jury of 12 look at this evidence. And then one thing about Officer Clack, when he says in his deposition, he says on the video, at 39, at 130 to 208, he says, he's driving down Jackson Street after Lee, and he's not in the video, but in his deposition, he states that he was following Lee down Jackson Street. That's a blatant lie. He says in his deposition, I think it's page 112, he states that he was, it's right here, he says he was, okay, 156, and he says he was following him, but it's a lie. Thank you, Mr. Phil. Thank you. Mr. Lindeman. May it please the Court, my name is Andrew Lindeman, along with Dave DeMasters, we represent the appellees in this case. And obviously there's summary judgment granted in this case on two distinct issues. One is the reasonableness of the shooting of the plaintiff's dog, and the second issue, of course, is the reasonableness of the stop and arrest of the plaintiff following that incident as he drove off. Touching first on the reasonableness of the seizure, we would submit that the district court properly analyzed the issue, and, in fact, the report and recommendation goes through the evidence in great detail, goes through the evidence in a light most favorable to the plaintiff. What is significant about this case, this is the classic case of where the Supreme Court's decision in Scott v. Harris comes into play, where you have videotape evidence, and the videotape evidence obviously doesn't lie, doesn't forget. It clearly shows exactly what happened on that particular day, and you have three different dash cam videos that, together, when you look at those, spell out exactly what happened. The only absence is you obviously do not see the shooting itself of the dogs and the dogs running from the home. But there is absolutely no dispute by the parties that the following events essentially happened, and this is based upon what the plaintiff knows, and, of course, you've got to recall that the plaintiff is the person who actually summoned the police to his home. He summoned the police to his home. He certainly should have been aware that they were arriving. This is not a situation where their arrival was unexpected or they were serving a warrant or anything along those lines. They could have put the dogs away, and obviously the dogs were on the front porch as the officers drove by and then immediately chased after the vehicle, and there's no dispute about that. At that point, however, Mr. Lee had gone in the house to get his paperwork to be able to talk to the police about, so he didn't observe any of this occurring. He came back outside after the shooting had already occurred. Now, the video from Officer Lyon's vehicle, and that's the vehicle that Officer Giglio was traveling in as a passenger, shows a number of things. Number one, it shows that the vehicle did pass the plaintiff's yard and parked probably about 75 to 100 feet beyond his driveway in front of the neighbor's yard, and that's where the car stopped. The video also shows, and I should really say the audio. One point you left out that I think is important is that the officers were told to turn their video on before they got there by other officers because of the prior problems at that location. That's exactly right, and so that's why they were actually running their video for a routine, essentially to take a police report. There had been a previous incident. In fact, affidavits were filed and are part of the record indicating what that previous incident was, and that other officers had problems actually in that particular period of time, which was about six months earlier, when they arrested the plaintiff. They had problems securing his residence and getting the dogs into the residence. So that's absolutely a key point, Judge Traxler. But another point that actually Judge Traxler made earlier in his comments I think is exactly right because you can hear on the Lyon's video what happens after those officers stop, and you can distinctly hear, and you've got to remember, the microphone is being worn by Officer Lyons, and you can distinctly hear car door open, car door close. It's definitely a more distinctive, louder car door close. And then a short period of time passes, and before you hear any type of shots fired, you hear another car door close, and that's obviously the passenger door that Officer Giglio got out of. I believe absolutely if you listen to that audio carefully, you hear that. Then you hear another few moments pass, and then you hear dogs barking, and then you hear the three shots in succession. And then you actually do see Officer Giglio come into the video as he's moving back around the back of the vehicle, and it's all consistent with the testimony from both officers that indicated that the dogs were running at Officer Giglio. He, in fact, describes the incident later on the exact same video when he's particularly talking to the plaintiff's girlfriend, that he felt trapped, that the dogs were coming at him, he was trapped. You know, there's an issue that the plaintiff claims is an issue of fact and dispute as to the distance that the dogs were from Officer Giglio at the time he fired, and quite frankly, it's very consistent. Officer Giglio said about 15 to 20 feet. The witness that the plaintiff wants to rely on, which is Christopher Potts, with that handwritten affidavit, it's even questionable to me whether that qualifies as an affidavit, but he said 20 feet. And Mr. Potts was actually in the work van that was driving down the road towards this home. He doesn't say that in his affidavit. You actually have to piece that together from a point that Mr. Lee made, even though Mr. Lee didn't actually see that. He's in that van that stops. He's in the CPI van that stops. But actually, if you look at the video closely from Officer Lyon's vehicle, at the time the shots are fired, the CPI van in which Mr. Potts was was still moving and was, by my estimation at least, a good two houses away. So how good was his ability to see particularly where the property line is, where the dogs were exactly. But, again, the main point he makes is that it was about 20 feet, and that's not anything greatly inconsistent with what Officer Giglio said. Officer Giglio says he had three seconds to respond. I think that was probably long. If you've got two big 80-pound pit bull mixes, boxers, I mean, these are not chihuahuas. These are big dogs moving quickly. It's been conceded by the plaintiff that they are friendly dogs. They will run at visitors. I think what is also significant is a lot of the comments by his girlfriend on the videotape. You can hear her afterwards. Number one, she describes that this happens all the time, that the dogs do chase after people. She also indicated that the mailman is scared of them. And these are big dogs. You actually, if you look at Officer Marshall, Captain Marshall actually arrived on the scene afterwards, and he parked a little farther down the street. And if you look at his video, you can actually see both of the dogs. They both are in the street, including the dog that was shot. So you can see the size of the dogs. We also put into the record vet records that shows that the dog in question that was shot is described in the veterinary records as a boxer-pit bull mix. So, I mean, these are what the law generally recognizes. The Altman case generally recognizes, and Altman's not alone. In fact, the magistrate judge went through a number of cases from all over the country identifying that pit bulls are the type of animals that are inherently dangerous or can be viewed as dangerous. So you've got an officer who has a split second to react. It's a classic case of applying the rules from Graham versus Conner. I mean, you can't apply hindsight and find the actions were unreasonable. This officer had to respond immediately, quickly, to a situation where he not necessarily thought his life was in danger, but he was in danger of serious bodily injury. These were big dogs that could inflict harm. And he fired a shot, missed. One of the dogs stopped. The other dog kept charging. And so he fired in succession and unfortunately hit one of the dogs, but that was what he had to do to protect himself. I believe the balancing test, again, as the district court clearly goes through, shows that in this particular case, officer safety clearly outweighed the rights of the property owner to the livelihood of the dog. It's an unfortunate situation, obviously, but it's unfortunately a situation that does occur. So in our estimation, and we would submit to this court, that the analysis is absolutely correct by the district court. The district court took the facts in a light, most favorable plane. If that is clear, because the facts can be largely gathered from the videotapes themselves. As far as the ‑‑ and let me touch on one other question before I move to the other issue. This whole idea that the dogs were under control is absolutely not correct. They were not leashed. There was not a fence. As I indicated, the plaintiff knew that the officers were coming and took no means to actually secure them. He actually, it was his dogs, he, you know, testifies that he had great control over the dogs verbally. But he's the one who went inside. So at the time these events occurred, he was inside getting his paperwork. He left his girlfriend. And his girlfriend indicated that she could not control the dogs. And there's no indication to answer Judge Motz's question from earlier, no indication that the girlfriend actually chased after the dogs or took any action to try to stop them. There's no indication on the video or in any of the testimony that she left the porch until after the incident had occurred. So, again, we believe that when you apply the appropriate balancing test, apply the rules from Graham versus Conner, very, very obviously well‑established principles of this court as applied many, many times, that the actions of Officer Giglio were absolutely reasonable and that there was no Fourth Amendment seizure. As far as the second issue dealing with the arrest itself, the key facts of that arrest are all contained on video. First of all, within about five minutes after the incident occurring, you see at that point in time two other officers had pulled up. Everyone was running their dash cam. So the record contains not just Officer Lyon's dash cam, but also the captain's video as well as the other co‑defendant, which is Royce Clack, who also came up to the scene. Everybody was running their videos. You can piece things together by looking at those. And so what the evidence shows is about five minutes after the events, and, of course, you hear during the events. You don't see ‑‑ initially you don't see Mr. Lee, but you can hear him, and he is just cursing, absolutely acting hysterical and irrational. And, of course, his dog had just been shot, but still clearly that was his state of mind at that point in time. You say he was irrational? Yeah, I mean, I think anybody who listens ‑‑ He shot his dog. I'm not saying that that is not a reaction that he should have, but what I'm saying is ‑‑ What about the reaction of the police? What about after they shot the dog? Do you think that was a reasonable reaction when the owner wanted to assist the dog to emergency care? Well, I think the officer's conduct reflected on the videos was very professional. As far as stopping, and then I was getting to the point of the stopping. Now, what, of course, occurred is Mr. Lee backed out of his driveway, screeched his tires as he drove off, clearly drove not down the road but completely through a neighbor's property. And the way you know that is if you look at Officer Marshall's video. Officer Marshall, when he pulled up, pulled up on Jackson Street to the left side of the road. He was going to get a hamburger and French fries. He was going to care for his dog that he thought perhaps, and he was correct, mortally wounded. What do you do? What would you ‑‑ I don't know if you're a dog owner. It doesn't matter, but I think you would know one way or the other that people are very close to their dogs. I recognize that. So that's a family member that's lying there mortally wounded. So you don't think that he would drive rather quickly in some way than the other because he's trying to get a wounded dog to the hospital. But here's the situation that the officers faced. Fort Mill, as you are probably aware, is a suburb of Charlotte. This was 6.30 on a Monday evening, middle of rush hour. You can tell from the videos there's a good bit of traffic, not necessarily on Jackson Street but once they get on White Street and the main roads. And so the officers were concerned. Immediately, actually, Captain Anderson makes that decision that we better stop him because he was driving erratically right in their presence as they were leaving, squealing his tires, driving through the neighbor's yard. Would it make any difference to you if it was 6.30 and a family member was mortally wounded how you drove, trying to get them so they wouldn't die? Well, again, I ‑‑ No, answer that question. Would it make any difference? I would suggest, and if you're going to their argument about the doctrine of necessity. Answer the question. Would it make any difference? Well, certainly. Oh, it's 6.30, so I'll take my time. Certainly there would be reason, but of course, you know, Yonner, I do. Did the police officers try to help and run cold to get the dog there and help? There was ‑‑ No help, wasn't sirens going? Did they do that? They did not do that. As a matter of fact, brother, it wasn't helpful at all to help the dog after the dog was shot. Police officers. As far as trying to get them to the vet? Yeah, to help the owner. They summoned, they did summon animal control to be able to come to the scene and to be able to assist, and ultimately animal control was able to take the animal to a vet. The remains of the dog? I don't recall specifically whether the dog was still alive when animal control arrived, but the dog obviously did have fatal wounds at that point. But the point being is obviously, again, the police officers, did they have probable cause to make the stop? Certainly. I mean, you look at, as I was indicating, squealing his tires, driving through the neighbor's yard. By the time Officer Clark caught up to him, you can actually see on the video, doing an illegal U‑turn. And now illegal U‑turn was, you know, to avoid the police officer. Were the blue lights turned on before the U‑turn or after the U‑turn? The blue lights were turned on as he was leaving the residence. You can see that on the video. He does not turn on the siren until he goes from, and you can hear it from Jackson Street onto White Street. But he had a blue light on immediately when he's leaving the residence. That's my recollection of the video. If you look at Marshall's video.  He wanted to stop him from driving what they viewed as reckless. And the evidence certainly, I would submit, supports that. And then ultimately, the evidence built and built and built before he stopped. Because as I indicated, when he got out on White Street, you could see, and it's on the video as well, you can see the illegal U‑turn that was made in heavy traffic. Then you can see the officer got back behind him. He had blue lights on obviously at that point and siren. The officer, I mean, the plaintiff was not stopping. He used his microphone. You can hear it on the video, to instruct the driver to stop. I don't know the distance that they went on, but it was clearly quite a few seconds. I would say, I didn't actually time it, but I would say certainly more than 30 seconds. And it certainly could be easily looked at from the video before the plaintiff actually stopped. And during that period of time, he never went completely right of center, but his wheels were definitely going right of center as well as he was driving. And, you know, obviously we know, and that's why I go back to that, and I'm not saying it was not inappropriate for him to be upset, but he was clearly very irrational, very upset, and not necessarily somebody you want behind the wheel driving. I mean, that's why we have EMS. I know there's no EMS for animals, but, of course, going back to Judge Greger, your analogy is if this was a family member, I mean, obviously EMS deals with those situations all the time, and they can't drive erratically and dangerously. So it was a balancing situation that they had to do, but there was certainly probable cause or reasonable suspicion to make the stop, probable cause ultimately to make the arrest. It was probable cause for reckless driving, which ultimately was not charged, even though that was the initial reason for the stop. I wouldn't think it would be. And then there was obviously he pled guilty to two offenses for destruction of town property, as well as for violating the dog at large ordinance. So he pled guilty to both of those offenses. So I would submit that the false arrest, false imprisonment claim under the Fourth Amendment, clearly there was probable cause that supports Officer Clack's decision. Would it make any difference if these were two chihuahuas? Well, it certainly could because a number of the factors that come into play is the size of the dog, whether they're dangerous, what their actions are. The dogs would be running after them, nipping at his heel, at his ankles. Would that change? Well, these were not. You're talking about the law here, right? Right. I'm asking you a question, hypothetical, if there were two chihuahuas, ran off the porch, tearing at them, tore after the officer, and they were about to nip at his ankle, he would be shot. Same legal result, right? Qualified immunity, right? Under your theory. Right. Well, ultimately in this case they did not grant qualified immunity. They found no constitutional violation. But certainly it can factor in. And, of course, that's the situation in Altman. And I know your Honor's dissent in Altman, you looked at that there were different situations with different animals. And ultimately Altman is significantly distinguishable from this case as well, because there you're dealing with animal control officers. You're not dealing with the immediacy that Officer Giglio was facing. So, you know, part of the analysis is the size and the threat. And whether or not, I mean, an officer could describe the threat of a chihuahua as being significant. I think that would be potentially not objectively reasonable, given the type of breed, unless there was some distinct action taken by a smaller dog to actually threaten the officer. But here you had, and, again, you can see the dogs. You can see both of them on the martial video. There's no disputing that they were running at Officer Giglio. You know, there's the suggesting that they were mouthing. But mouthing, of course, as the magistrate judge explains in her report and recommendation and provides a definition, shows the dogs are opening their mouth. I mean, it obviously could be interpreted as some sort of baring their teeth or threatening, even if that was the case. And, of course, that came only from Mr. Potts, who was some distance away with his observations and was still moving in his vehicle at that point. But the bottom line is, to answer your Honor's question, you know, I think the type of breed is a factor, and certainly in Altman, this court indicated that it is a factor. And the magistrate judge in this case cited cases from other jurisdictions where they looked at the breed of the dog as a factor. But here, we clearly have a pit bull mix, which is recognized as a dangerous breed, and certainly you can see the size of the dogs. And charging at him, again, we would submit that his actions were reasonable in providing for officer safety over the pet itself. I see my time is coming to a close. It's out of close. What's that? It's out of close. It's out of close. Oh, I am. You're right. I apologize. I see the clock's going the other way now. We would ask that the court affirm the district court. Thank you, Your Honors. Thank you, Mr. Dunlap. Mr. Field, you have a few minutes reserved. Thank you. Scott B. Harris doesn't apply because, in this case, the affidavits do clearly line up with what the video shows. I think that's completely inapplicable. The video shows a hundred feet. The car is five or ten feet past the driveway. It's not a hundred feet past the driveway. And then they turn the video on. Prior problems were recorded. Well, thank God the video was on. Thank God for the videos in this case. Thank God for those. So the dogs were not running loose. They weren't roaming the streets. They weren't attacking anyone. That's significant. That's significant. We don't apply the hindsight. Molly says no in video 38 at 13 minutes precisely. She says no as the dogs are running. You can hear her say no. Judge Travis, if you hear the door shut, I mean, we don't see the door shut. Do you think that helps you with this fact she said no? Yes, she's trying to control the dogs. But the dogs kept running. Well, I tell my dog no all the time. He does what he wants. I know because that's why people are afraid of your dog, if they are. Well, dogs can be to the owner's net. Mr. Field, the fact that she clearly said no because we know the dogs did continue. I'm just saying she said that, Judge Gregory. I was thinking more of a question like talking directly to the officers, telling them, listen, yes, they're coming, but they're friendly, they don't bite, they're pets. I think it happened to, I'm just speculating. I don't know. I'm just, that's all. I understand. On the video, Judge, Captain Marshall says, on video 38 at 940, he says, he's not going to act like that, kind of be rude to the officers as he was and ride in other people's, and risk other people's lives. Whose lives? There's no one on the video. They talk about there's people on the street in Jackson. You watch that car, there's nobody on that street. Nobody. He says, I'm following down Jackson Street. He took Sidney whatever Bartlett right next to him. He wasn't even on Jackson Street. He said, follow him all the way down Jackson Street. Video, nowhere to be seen. Thank God for the video. Mr. Bill, let me ask you this. Officer Clack is trying to catch up to your client. Right. Before he can catch up with him, he sees him do a U-turn across the double yellow line. On 160. What should an officer have done, in your view? Well, I think he could have. In view of all the circumstances. I think he could have. I'm sorry. I think he could have stopped him and said, follow me to the vet. Follow me to the vet. That's the point my client wants to make. They were so rude to him the whole time. The whole time. Treated him like a criminal. He was free to leave. We talked about that. He said, he could leave. He was free to leave. He went around that car, too. His affidavits say, no, he was driving somewhat non-eradical or with some caution or something. I think he wasn't willful and wanton under the South Carolina law that he was driving recklessly. They didn't charge him with reckless driving. I don't think he violated the statute. Well, you can't do that. You can't do that. But he could have stopped him and helped him. They didn't help him. They were rude to him. They were very rude. They kept him in the back of that car. You see that video? He's going crazy. He's not. I just don't understand what you think he should have done after he witnessed that. You're saying he should have led the plaintiff, in this case, to the affected area? He could have done something more to distract her than keep him in the back of the car and keep him confined and watch him. What is the mole? Take him to the vet. Follow him to the vet. Put the dog in the police car? He's constitutionally required not to be rude. I don't understand what it is you think he should have done. Ma'am? He's constitutionally required not to be rude and to take the dog to the vet. No, I'm not saying that. No. So then what was he required to do? Well, he could be a human being. He could be. But he wasn't. But we all are. No, I don't think that. They've lied. They've lied. They've misrepresented to the court. They've misrepresented. They weren't roaming loose. He wasn't in fear for his life. He just didn't want to get bit. They had zero training. They weren't roaming the streets. They weren't chasing after people. The false arrest. The officer says, I'm not going to let him act like that and risk other people's lives over a damn dog. That's what Officer Marshall says, over a damn dog. That's what he says. This is his family pet. He slept with him at night. This is their whole attitude. They were rude as can be to this man, rude as hell to him in his house. Get that dog in the house. Don't talk to me like that. He was upset. And then they shot his dog. They came over on a call and shot the dog. It's not reasonable. And I think a jury of 12 could easily find that under the calculus, the weighing of the private interest versus the public interest, that the private interest, they were not roaming the streets. They weren't at loose. The weighing is there. It's constitutional. It's not subjective. I think that a jury could find that. A reasonable juror could find that. I think the decision was incorrect. Thank you. Thank you, Mr. Phil. We'll come down and get counsel and go to our next case.
judges: Roger L. Gregory, Diana Gribbon Motz, William B. Traxler, Jr.